AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
### District of Delaware

SEALED *UNSEALED* 10/21/21 KJK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

**the person of Richard "Rick" Charles Schriber**

Case No. 21-**280 M**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

REDACTED

**See Attachment A.**

located in the _____ District of _____**Delaware**_____ , there is now concealed *(identify the person or describe the property to be seized):*

**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252A(a)(2); | Receipt and Distribution of Child Pornography; |
| 18 U.S.C. 2252A(a)(5)(B) | Possession of Child Pornography |

**FILED**

**OCT 18 2021**

U.S. DISTRICT COURT DISTRICT OF DELAWARE

The application is based on these facts:

**See attached Affidavit.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Susan Paris
*Applicant's signature*

Susan A. Paris, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____**telephone**_____ *(specify reliable electronic means).*

Date: **10/18/2021**

*Judge's signature*

City and state: **Wilmington, DE**

Jennifer L. Hall, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:
1) the premises known as █████████████

2) the premises known as █████████████
█████████████; and
3) the person of Richard "Rick" Charles
Schriber

Case No. 21- 280 M

**FILED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Susan Ambridge Paris, a Special Agent with the Federal Bureau of Investigation ("FBI"),

being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search: 1) the premises known as █████████████,

█████████████; 2) the premises known as █████████████████████████;

(hereafter collectively identified as the "SUBJECT PREMISES"); and 3) the person of Richard

"Rick" Charles Schriber (hereafter identified as "SCHRIBER") (together, the "SUBJECT

LOCATIONS") further described in Attachment A, for the items described in Attachment B. Both

Attachments A and B are incorporated herein by reference.

2.      I am a Special Agent with the FBI and have been since June of 2016. I am currently

assigned to the Maryland Child Exploitation and Human Trafficking Task Force in the Baltimore

Division of the FBI and have been assigned investigations concerning sexual exploitation of

children and child pornography. During my employment with the FBI, I have gained experience

through training in seminars, classes, and daily work related to conducting these types of

investigations. In addition, I have also received training regarding the use of the Internet and

digital communications as they pertain to federal investigations. I have participated in the execution of numerous search warrants, some of which have involved child exploitation offenses. Many of the search warrants resulted in the seizure of computers, cell phones and/or "smart phones," magnetic storage media for computers, other electronic media, and other items evidencing violations of federal laws. I have also participated in the execution of numerous search warrants for online accounts, such as email accounts, online storage accounts, and other online communication accounts related to child exploitation and/or child pornography. In the course of my employment, I have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media and within online accounts.

3.      As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4.      As described in more detail below, there is probable cause to believe that, on or about September 2018 to on or about August 2019, SCHRIBER received, distributed, and possessed child pornography in violation of Title 18, United States Code, Sections 2252A(a)(2) (Receipt and Distribution of Child Pornography) and 2252A(a)(5)(B) (Possession of and Access with Intent to View Child Pornography) (together, the "SPECIFIED FEDERAL OFFENSES").

5.      The statements contained in this affidavit are based in part on information provided by FBI Special Agents; written reports about this and other investigations I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of administrative subpoenas; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training, and background as a special agent

2

with the FBI. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, evidence, fruits, and instrumentalities of the violations of the SPECIFIED FEDERAL OFFENSES are located within the SUBJECT LOCATIONS.

## SPECIFIED FEDERAL OFFENSES

6.     As noted above, this investigation concerns alleged violations of the following:

•     In pertinent part, Title 18, United States Code, Section 2252A(a)(2) (Distribution and Receipt of Child Pornography) prohibits a person from knowingly distributing or receiving any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any mean, including by computer.

•     In pertinent part, Title 18, United States Code, Section 2252A(a)(5)(B) (Possession of and Access with Intent to View Child Pornography) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

7.     The following definitions apply to this Affidavit and Attachment B:

•     "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

3

- "Chat room," or "chat groups," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room.

- "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

- "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

- "Cloud storage" is an online central storage location that allows users to access their files from anywhere using a device connected to the Internet.

- "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, tablets, and mobile phones and devices. See 18 U.S.C. § 1030(e)(1).

- "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

- "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code

4

may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

• "Hashtag," as used herein, refers to a word or phrase preceded by a hash or pound sign (#), which is used to identify messages or groups on a specific topic.

• "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

• The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

• "Internet Protocol address" or "IP address," as used herein, refers to a numeric or alpha-numeric label used by a computers or other digital devices to access the Internet. For example, Internet Protocol version 4 defines an IP address as a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Another example, Internet Protocol version 6, uses both numbers and letter (e.g., 2001:db8:0:1234:0:567:8:1). Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs", defined below) control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

• "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

• "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

• "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

- "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

- "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

- "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals or pubic area of any person.

- A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

- "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## SUMMARY CONCERNING CHILD PORNOGRAPHY, PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY, AND HOW USE OF COMPUTERS AND THE INTERNET RELATES TO THE POSSESSION, RECEIPT AND/OR DISTRIBUTION OF CHILD PORNOGRAPHY

8.     Based on my investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the Internet to view, download, and/or distribute child pornography are individuals who have a sexual interest in children and in images of children.  In addition, there are certain characteristics common to such individuals, including the following:

a.     Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

6

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts, or other online communication accounts, to enable the individual to view the collection, which is valued highly.

e.      Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

f.      Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This

7

behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography.

9. Based on my investigative experience related to computer and Internet-related child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

a. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies.) The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

b. The development of computers, smartphones, and the Internet have added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers, smartphones, and the Internet serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

c. Mobile devices such as laptop computers, smartphones, iPods, iPads, and digital media storage devices are known to be used and stored in vehicles, on persons, or other areas inside or outside of the residence.

d. Smartphones have the capability to access the Internet and store information, such as videos and images. As a result, an individual using a smartphone can send, receive, and store files, including child pornography, without accessing a personal computer or laptop. An individual using a smartphone can also easily plug the device into a computer, via a USB cable, and transfer data files from one digital device to another. Many people generally carry their smartphone on their person.

e. Child pornographers can now transfer photographs from a camera onto a computer-readable format. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.

8

f.　　　Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services, easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

g.　　　The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. Collectors and distributors of child pornography use online resources to retrieve and store child pornography, including services offered by Internet Portals such as AOL Inc., Yahoo, Google, Inc., Facebook, Dropbox, Instagram, Twitter, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, file exchange services, messaging services, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Email accounts, online storage accounts, and other online communication accounts allow users to save significant amounts of data, including email, images, videos, and other files. The data is maintained on the servers of the providers and is occasionally retained by the providers after the user deletes the data from their account.

h.　　　In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

i.　　　Based on traits shared by collectors, the use of email, online storage accounts, and other online communication accounts, and the increased storage capacity of computers and server space over time, there exists a fair probability that evidence regarding the SPECIFIED FEDERAL OFFENSES will be found on any devices seized pursuant to this warrant, notwithstanding the passage of time.

j.　　　In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.[1]

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (Collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

k.      When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

l.      In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

m.      The storage capacity of personal computers has increased dramatically over the last few years. Common and commercially available hard drives are now capable of storing over 500 GB of data. With that amount of storage space, an individual could store thousands of video files and/or hundreds of thousands of image files.

n.      Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Since the storage capacity of hard drives has increased dramatically over the last several years, it is more likely that the above-described information will be recovered during forensic analysis.

## BACKGROUND OF PROTONMAIL

10.      According to their website, ProtonMail is "an easy to use secure email service with built-in end-to-end encryption and state of the art security features." ProtonMail is unable to access client data. Client data is encrypted and ProtonMail does not possess the encryption key.

11.      ProtonMail offers both a free and paid-for service. The free account includes 500MB of storage, 150 messages per day, and limited support. There are three types of paid-for accounts which offer increased storage, email aliases, the ability to send more messages per day and other enhanced features. In order to create a free account, the user must create a username and password. There is the option to add a recovery e-mail address and upon creating the account, the user must verify the account with another e-mail address or through text message.

12.    Users can also set an expiration time to messages they send so they will be automatically deleted from the recipient's inbox. This service can be used even if the recipient is using a non-ProtonMail account.

13.    ProtonMail also offers an app available for use with iOS or Android.

14.    ProtonMail is based and incorporated in Switzerland.

### BACKGROUND OF IMAGEFAP.COM

15.    ImageFap is a free pornographic website. Users can register and create profiles and upload videos and images. Images can be uploaded into a gallery and there is no limit to the number of images uploaded. Within their profiles, registered users can post a contact e-mail address, date of birth, location, and other personal details. Their profile also displays when they signed up, how many images they viewed, how many images they uploaded, and when they were last online. Individuals can also comment on images posted by registered users.

16.    The website is operated by Youngtek Solutions Limited. According to their website, Youngtek Solutions Limited is located in Cyprus.

### BACKGROUND AND STATEMENT OF PROBABLE CAUSE

17.    The current investigation arose from an investigation conducted by the FBI's Portland, Oregon division. FBI Portland identified Robert Gerrity as a person of interest with respect to child pornography offenses. Specifically, FBI Portland learned that Gerrity was engaged in the distribution of child pornography via e-mail with rattleratlarge@gmail.com. As part of its investigation, FBI Portland obtained a search warrant for rattleratlarge@gmail.com. The information provided by Gmail pursuant to the warrant led to the identification of SCHRIBER as the individual with whom Gerrity communicated.

**A.  Communication between** ▆▆▆▆▆▆▆▆▆ **and rattleratlarge@gmail.com**

18.    On or about September 13, 2018, e-mail user rattleratlarge@gmail.com
(hereinafter, "rattleratlarge") sent an e-mail to ▆▆▆▆▆▆▆▆▆. The user of
▆▆▆▆▆▆▆▆▆ was identified by FBI Portland as Robert Michael Gerrity (hereinafter,
"Gerrity"). In the e-mail, "rattleratlarge" references the website ImageFap and includes multiple
picture collages. Many of the images in the collage appear to be the same adult female in sexual
and nonsexual poses. "Rattleratlarge" referred to this adult female as "Deb."

19.    On the same date, "rattleratlarge" sent another e-mail to Geritty, which included
multiple pictures of the same adult female he previously sent; "Deb." Also included was a non-
pornographic picture of "Deb" and an adult male. The eyes of the male were blacked out, but the
rest of his face could be seen.

20.    On or about September 19, 2018, "rattleratlarge" sent an e-mail which contained a
non-pornographic picture of an adult male, adult female, and two young females sitting on a couch.
Like the image sent on September 13, the eyes of the adult male and one of the young females are
blacked out, but the rest of their faces can be seen. The other two females in the picture are fully
visible. The adult female appears to be "Deb" from the September 13 e-mail. Underneath the
picture, "rattleratlarge" wrote, "Picture of a family with the faces of the female active members
visible. Hmmm who could they be?"

21.    On or about September 20, 2018, Gerrity sent approximately 16 images of child
pornography to "rattleratlarge." One of those images is actually a collage of four images depicting
a nude prepubescent girl posing on green fabric with a brick construction scene in the background.
In one image, the girl is leaning back on the green fabric with her legs spread, exposing her

genitals. In another, the girl is in nearly the same pose, except she has a white bucket over her head and a corded power drill placed against her genitals.

**B. Communication between** ▇▇▇▇▇▇▇▇▇▇▇▇▇ **and**
**invested1157@protonmail.com**

22.    In addition to the Yahoo e-mail account, FBI Portland learned that Geritty also used the Proton e-mail address ▇▇▇▇▇▇▇▇▇▇▇, and was in contact with invested1157@protonmail.com (hereinafter "invested1157").

23.    On or about September 23, 2018, Geritty sent "invested1157" an e-mail containing approximately eight images of child pornography. One image depicted a topless prepubescent girl with glasses performing oral sex on a standing, naked adult male. The next day, in response to this e-mail, "invested1157" wrote: "…Now as to the pics embedded and my pick for a story line. I would have to say no contest on this one. It's the little gal with glasses," and "…These are great pic's [sic] you've supplied. I find myself actually stroking myself as I look over them again and again. Below is the reason for my choice of photo's [sic]." "Invested1157" then embedded what appeared to be a scanned polaroid photograph of a clothed prepubescent female with glasses standing in front of a piano at Christmastime.

24.    On or about October 1, 2018, Geritty sent "invested1157" an e-mail containing approximately four images of child pornography. One image depicted a minor female, her face blurred out, with her mouth on the genitals of a naked adult male. "Invested1157" wrote back, "First commenting on your 4 attached pics. Never seen so much pearl sauce sprayed around the younger set. How thoughtful of pic taker #4. He's got her rimming his "A" hole hitting his go button between his balls and ass yet he still shields her face. He's probably sharing that same little face with some of his buddies as well. Too good to keep all to himself."

13

25.     Throughout their e-mail exchanges, "invested1157" talked about his sexual experience with his younger daughter when she was a teenager. On or about October 2, 2018, "invested1157" wrote the following: "Sorry I don't have any pics for you to enjoy a visual of her at this age. There are a few but they are locked away and have never been scanned. Wasn't going to share this but here's something to look at from around her junior year in college..." Below the text, "invested1157" included a picture of a fully clothed young female, with her face visible, sitting in a green chair.

26.     On or about October 8, "invested1157" sent an e-mail to Geritty with the subject line, "Comment are you here all the time." "Invested1157" goes on to write, "Short answer no. I've got 4 computers, house, shop, office, and horse barn. Periodically do quick check thru out [sic] the day of all e mail accts. In as much as I correspond with several dozen people on and off, I do a quick look,see [sic] and if it's some one [sic] such as yourself that I enjoy a good back and forth with, I'll answer on the spot time permitting...Probably avg. an hour to an hour and a half total on line [sic] presence daily including e mails [sic] and surfing."

27.     On or about October 30, 2018, "invested1157" sent an e-mail to Geritty containing multiple pictures of an adult female engaging in various sexual and non-sexual activities. Her face is clearly visible. These pictures are of the same adult female, referred to as "Deb," that "rattleratlarge" sent to Geritty's Yahoo e-mail account.

28.     On or about July 13, 2019, "invested1157" wrote to Geritty, "Got quite a bit of material however it's all stored on encrypted off unit thumb drives at the moment...Would love to receive some new materials from you when available. You seem to locate titillating materials and our tastes are actually quite similar."

29.     On or about July 28, 2019, "invested1157" sent an e-mail to Geritty stating, "I've been officially screwed. Went to open my extensive files to share some of the photos I've been collecting with you and sanidisk [sic] is saying my drive has lost it's [sic] main path or has been physically removed from the disk. It included everything you shared with me as well as those I've shared with you in addition to hundreds of others I had in my possession."

30.     The following day, "invested1157" sent Geritty another e-mail saying, "Figured you were getting tired of Deb so sending a few I didn't loose [sic] on the encrypted drive." Attached to this e-mail were approximately five images of child pornography. One image depicted a prepubescent girl performing oral sex on an adult male.

31.     On or about July 31, 2019, Geritty sent "invested1157" an e-mail containing approximately seven gifs[2] and one video of child pornography. The video was approximately one minute and six seconds in length with file name "1Mom_end_son." In the video, an adult female performs oral sex on a prepubescent boy who is laying on a bed. She then proceeds to sit on top of the boy while engaging in vaginal intercourse. In the background there is a laptop playing cartoons. On or about August 1, 2019, "invested1157" responds, "Great gifs. Helps restore the library. Many thanks. Loved the tiny cock the cartoons playing in the background..."

**C.  Identification of rattleratlarge@gmail.com and invested1157@protonmail.com**

32.     A search of rattleratlarge@gmail.com was performed pursuant to a federal search warrant issued in the United States District Court of Oregon.[3] The following account information was provided:

---

[2] A "gif" is a type of format in which an image can be stored. GIF format supports both animated/moving images and static images.

[3] Case No. 19-MC-570(B).

    a.  Name: RC Schriber

    b.  Recovery e-mail: rcschriber@gmail.com

    c.  Last login: 2019-03-27, 08:10:39 UTC

    33.    A review of the "rattleratlarge" account showed that Geritty, previously identified as using e-mail address  █████████████  sent multiple links from ImageFap to "rattleratlarge." Additionally, the "rattleratlarge" account conducted online queries involving addresses and information pertaining to the Delaware area, to include: "Christiana Mall: Shopping Mall in Newark, DE" and "historical wilmington delaware." Other searches included "How to Reset Toyota 4Runner Maintenance Light (2003-2020)" and "2012 4Runner."

    34.    Investigation by the FBI determined that rattleratlarge@gmail.com and invested1157@protonmail.com likely belong to and are used by SCHRIBER. This is based on following:                   the

    a.  A search of publicly available records identified Richard Charles Schriber, aka Rick Schriber, as residing at  ████████████████ . Delaware records show SCHRIBER is the registered owner of a 2011 Toyota 4Runner.

    b.  A search of SCHRIBER through the Delaware Criminal Justice Information System ("DELJIS") produced a picture of him. SCHRIBER appears to be the same male in the pictures "rattleratlarge" sent to Geritty on September 13 and 19, 2018.

    c.  ImageFap was searched pursuant to investigation and resulted in a profile for Rattler69. The user was last online September 29, 2021. The contact e-mail for Rattler69 was "invested1157@protonmail.com." On August 15, 2021, Rattler69 uploaded a collage image to his gallery titled "Before and After 159." The collage

16

contained five images of the same adult female depicted in the images of "Deb" that "rattleratlarge" and "invested1157" sent to Geritty.

d. SCHRIBER was named as the surviving spouse of Mary Schriber (hereafter "M. Schriber") in a March 2021 obituary. The picture included in the obituary as well as a social media profile picture for M. Schriber shows she is the same female referred to as "Deb" in the images sent to Gerrity by both "rattleratlarge" and "invested1157."

e. Open source searches indicate that SCHRIBER has two adult daughters. One of the daughters appears to be the same young female whose full face is visible in the picture "rattleratlarge" sent Geritty on September 19, 2018.

35.    An open source property search for █████████████████████████ and █████████████████████████ shows the current owners as Mary C. Schriber and Rick C. Schriber.

36.    On September 30, 2021, an FBI Agent observed ████████████████████, ████████████████████. A black mailbox with ██████ and ██████ was clearly visible from the street. The property is a multi-acre farm-type property. There are seven total buildings/structures on the property, including the main home, a barn, a couple large garages, and a few sheds. There is one mailbox for the entire property, and the numbers ████████████████ are both affixed to the mailbox.

37.    A review of publicly available records listed the following individuals as possible current residents of ████████████████████████████████ ████████████████: Richard Charles Schriber and ████████████████, believed to be SCHRIBER's oldest daughter.

17

## SUMMARY

38.     Based on the facts detailed above, there is probable cause to believe that SCHRIBER is the user of rattleratlarge@gmail.com and invested1157@protonmail.com; that SCHRIBER utilized these accounts to engage in the SPECIFIED FEDERAL OFFENSES; that SCHRIBER has a sexual interest in prepubescent children; and that contraband, evidence, fruits, and instrumentalities of the violations of the SPECIFIED FEDERAL OFFENSES are located within the SUBJECT LOCATIONS.

39.     First, there is probable cause to believe SCHRIBER is the user of rattleratlarge@gmail.com and invested1157@protonmail.com. This is based on the name registered to the rattleratlarge@gmail.com account as well as pictures sent from the accounts. The male in the pictures appears to be SCHRIBER, based on information pulled from the DELJIS report. Additionally, the images of "Deb" sent from both accounts appear to be Mary Schriber, SCHRIBER's wife, and the non-pornographic family photo sent by "rattleratlarge" shows what appears to be Mary Schriber and SCHRIBER's youngest daughter.

40.     Second, there is probable cause to believe that SCHRIBER distributed and received child pornography through e-mail. While investigating Geritty, the FBI found e-mail messages between Geritty and SCHRIBER (using e-mail addresses rattleratlarge@gmail.com and invested1157@protonmail.com) which contained child pornography.

41.     Third, there is probable cause to believe that SCHRIBER has a sexual interest in prepubescent children. After receiving child pornography from Geritty, SCHRIBER told Geritty "I find myself actually stroking myself as I look over them again and again." Additionally, SCHRIBER told Geritty he was collecting photos and had hundreds in his possession when he encountered a problem with the storage drive where they were located. SCHRIBER was able to

18

recover some of those files and sent child pornography to Geritty. Thus, there is probable cause to believe SCHRIBER has a sexual interest in prepubescent children.

42.     Last, there is probable cause to believe that contraband, evidence, fruits, and instrumentalities of the violations of the SPECIFIED FEDERAL OFFENSES are located within the SUBJECT LOCATIONS.  In addition to the above, based on my training and experience, and described further in paragraph 8, *supra*, individuals who have a sexual interest in children not only tend to collect child pornography, but tend to use multiple devices to view and collect child pornography.  In fact, SCHRIBER told Gerrity via e-mail that he (SCHRIBER) has multiple devices he uses, specifically in the house, shop, office, and horse barn. *See* Paragraph 26, *supra*. Such individuals often store or hide such collections and devices not only in their home but also in sheds, garages, or detached structures on the property, so that others (like family members) cannot find them.  Based on my training and experience, such individuals tend to keep these devices even once they have stopped using them.   Lastly, based on my training and experience, and further described in paragraph 9, *supra*, and paragraphs 45-49, *infra*, computer files or remnants of such files can be recovered months or even years after they have been viewed via the Internet, downloaded onto a storage medium, or even deleted.

43.     For these reasons, there is probable cause to believe that SCHRIBER used multiple devices to access child pornography and that he will be in possession of one or more electronic devices—including digital storage media—that contain contraband, evidence, fruits, and instrumentalities of the SPECIFIED FEDERAL OFFENSES.  Therefore, this warrant authorizes the search of every electronic device that belongs to SCHRIBER—both in the residence and in the adjacent structures—because there is probable cause to believe that they contain contraband, evidence, fruits, and instrumentalities of violations of the SPECIFIED FEDERAL OFFENSES.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

44. As described above and in Attachment B, this application seeks permission to search for contraband, evidence, fruits, and instrumentalities of the SPECIFIED FEDERAL OFFENSES that might be found at the SUBJECT LOCATIONS, in whatever form they are found. One form in which the evidence might be found is as records in the form of data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure and search of computers and storage media and, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

45. *Probable cause*. I submit that if a computer or storage medium is found on the SUBJECT LOCATIONS, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

46.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT LOCATIONS because:

e.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations; computer activity associated with user accounts; electronic storage media that connected with the computer; and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information

21

described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.      I know that when an individual uses a computer to access with intent to view, possess, distribute, or receive child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

47.     *Necessity of seizing or copying entire computers or storage media.*  In most cases,

a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the

warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

22

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on

the storage media, and to prevent the loss of the data either from accidental or intentional

destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence
takes the form of documents and files that can be easily viewed on site. Analyzing evidence
of how a computer has been used, what it has been used for, and who has used it requires
considerable time, and taking that much time on premises could be unreasonable. As
explained above, because the warrant calls for forensic electronic evidence, it is
exceedingly likely that it will be necessary to thoroughly examine storage media to obtain
evidence.  Storage media can store a large volume of information.  Reviewing that
information for things described in the warrant can take weeks or months, depending on
the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements. Computers can be configured in several different
ways, featuring a variety of different operating systems, application software, and
configurations.  Therefore, searching them sometimes requires tools or knowledge that
might not be present on the search site. The vast array of computer hardware and software
available makes it difficult to know before a search what tools or knowledge will be
required to analyze the system and its data on the premises. However, taking the storage
media off-site and reviewing it in a controlled environment will allow its examination with
the proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this warrant
could be stored in a variety of storage media formats that may require off-site reviewing
with specialized forensic tools.

48.     *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, and/or otherwise

copying storage media that reasonably appear to contain some or all of the evidence described in

the warrant, and would authorize a later review of the media or information consistent with the

warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in

order to determine whether it is evidence described by the warrant.

### BIOMETRIC ACCESS TO DEVICES

49.     This warrant permits law enforcement to compel SCHRIBER to unlock any and all

devices requiring biometric access subject to seizure pursuant to this warrant. The grounds for

23

this request are as follows:

a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices (like smartphones) and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.      If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged

24

in criminal activities and thus have a heightened concern about securing the contents of a device.

f.      As discussed in this Affidavit, your affiant has reason to believe that one or more digital devices will be found during the search. Specifically, SCHRIBER was using multiple computers/devices to access at least two e-mail accounts. Additionally, based on my training and experience, individuals can access their personal e-mail addresses through multiple electronic platforms, to include cellular phones. Both Gmail and ProtonMail, the e-mail providers used by SCHRIBER, offer mobile apps for use in iOS or Android. The passcode or password that would unlock the DEVICES subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.  Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of SCHRIBER to the fingerprint scanner of the devices found at the SUBJECT LOCATIONS; (2) hold the devices found at the SUBJECT LOCATIONS in front of the face of SCHRIBER and activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT LOCATIONS in front of the face of SCHRIBER and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.[4]  The

---

[4] "[I]dentifying physical characteristic[s]" are not testimonial and thus fall "outside [the] protection" of the Fifth Amendment. *Gilbert v. California*, 388 U.S. 263, 266-67 (1967). The privilege against self-incrimination, therefore, is not violated by an order compelling a person to submit to photographing and measurements or to provide fingerprints, writing samples, or voice exemplars. *See, e.g.*, *United States v. Dionisio*, 410 U.S. 1, 7 (1973); *California v. Byers*, 402 U.S. 424, 431-32 (1971); *Gilbert*, 388 U.S. at 266-67; and *Schmerber v. California*, 384 U.S. 757, 763-64 & n.8 (1966). Thus, compelling an individual to place a finger or thumb on the Touch ID of an

proposed warrant does not authorize law enforcement to request that SCHRIBER state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask SCHRIBER to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

50. Based on the foregoing information, there is probable cause to believe that contraband, evidence, fruits, and instrumentalities of violations of the SPECIFIED FEDERAL OFFENSES as set forth herein and in Attachment B, are currently contained in the SUBJECT LOCATIONS, more fully described in Attachment A. I therefore respectfully request that a search warrant be issued authorizing a search of the SUBJECT LOCATIONS for the items described in Attachment B and authorizing the seizure and examination of any such items found therein.

*/s/ Susan Paris*
Susan Ambridge Paris
Special Agent
Federal Bureau of Investigation

---

electronic device does not implicate the Fifth Amendment for the same reasons. *See In the Matter of the Search Warrant Application for [Redacted Text]*, 279 F. Supp. 3d 800, 800-06 (N.D. Ill. 2017) (holding that the compelled act of placing finger on device was not an act of communication and therefore not testimonial pursuant to the Fifth Amendment); *Matter of Search of [Redacted] Washington District of Columbia*, 317 F.Supp.3d 523 (D. D.C. June 26, 2018) (same); *Matter of White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 2019 WL 3401990 (D. Idaho July 26, 2019) (same); *Minnesota v. Diamond*, 890 N.W.2d 143, 151 (Minn. Ct. App. 2017) (same); *Virginia v. Baust*, No. CR 14-1439, 2014 WL 10355635 (Va. Cir. Ct. Oct. 28, 2014) (same); *see also United States v. Sanudo-Duarte*, No. CR-14-01342-002-PHX-JAT, 2016 WL 126283 (D. Ariz. Jan. 12, 2016) (holding that defendant could be compelled to provide exemplar of his palm prints since they were not testimonial); *but see United States v. Warrant*, 2019 WL 4047615, (N.D. Cal. Aug. 26, 2019) (disagreeing with courts that have concluded that compelling the application of a biometric feature is no different than compelling the provision of non-testimonial physical evidence).

26

Sworn to me over the telephone and signed by me pursuant to
Fed. R. Crim. P. 4.1 on this __18__ day of October, 2021.

HONORABLE JENNIFER L. HALL
UNITED STATES MAGISTRATE JUDGE

27

## ATTACHMENT A

### PERSON TO BE SEARCHED

The person to be searched is:

RICHARD CHARLES SCHRIBER aka RICK SCHRIBER ("SUBJECT PERSON"), DOB:

████████████████, who is a white male, approximately 5'11" in height and

approximately 184 pounds. Below are photos of SCHRIBER:

 

1

## ATTACHMENT B

## PROPERTY TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense; namely, violations of Title 18 United States Code, Sections 2252A(a)(2) (Receipt and Distribution of Child Pornography) and 2252A(a)(5)(B) (Possession of and Access with Intent to View Child Pornography) (the SPECIFIED FEDERAL OFFENSES):

1. All COMPUTERS and STORAGE MEDIA (as defined below) identified as belonging to RICHARD CHARLES SCHRIBER aka RICK SCHRIBER (hereinafter, "SCHRIBER" or "SUBJECT PERSON"), including:

   a. Those found on SCHRIBER's person; and

   b. Those found within close proximity to SCHRIBER's person.

2. For SCHRIBER's COMPUTERS and STORAGE MEDIA (hereinafter, "DEVICES"):

   a. evidence of who used, owned, or controlled the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

2

e. evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f. evidence of the attachment to the DEVICES of other storage devices or similar containers for electronic evidence;

g. evidence of programs (and associated data) that are designed to eliminate data from the DEVICES;

h. evidence of the times the DEVICES were used;

i. passwords, encryption keys, and other access devices that may be necessary to access the DEVICES that are found stored within the DEVICES

j. documentation and manuals that may be necessary to access the DEVICES or to conduct a forensic examination of the DEVICES;

k. records of or information about Internet Protocol addresses used by the DEVICES;

l. records of or information about the DEVICES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment;

n. any and all adapters, chargers, or other hardware items necessary to charge the battery, or to maintain the functioning of, the DEVICES;

o. records and information relating to the sexual exploitation of children, including files, correspondence, and/or communications about or stored on the e-mail accounts;

p. records and information showing access to and/or use of the e-mail accounts;

q. records and information relating or pertaining to the identity of the person or persons using or associated with the e-mail accounts

r. records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

s. Child pornography and child erotica in any form.

3

3. Records, information, and items relating to violations of the statutes described above including:

   a. records, information, and items relating to SCHRIBER's occupancy or ownership of the subject premises described in the affidavit, including utility and telephone bills, mail envelopes, or addressed correspondence;

   b. records, information, and items relating to the ownership or use of the DEVICES found, including sales receipts, bills for Internet access, and handwritten notes;

   c. records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

   d. Child pornography and child erotica in any form.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

4

During the execution of the search of the SUBJECT PERSON described in Attachment A, law enforcement personnel are authorized to:  (1) press or swipe the fingers (including thumbs) of SCHRIBER to the fingerprint scanner of the DEVICES found; (2) hold the DEVICES found in front of the face of SCHRIBER and activate the facial recognition feature; and/or (3) hold the DEVICES found in front of the face of SCHRIBER and activate the iris recognition feature, for the purpose of attempting to unlock the DEVICES in order to search the contents as authorized by this warrant.

This warrant authorizes a review of computer and storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.